**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

UNITED STATES OF AMERICA

v.

DERRACE RESHAND DAMONS,

    **Defendant.**

CRIMINAL CASE NO.

  **2:24-CR-00021-SCJ**

## ORDER

This matter appears before the Court on the Report and Recommendation ("R&R") filed by the Honorable Anna W. Howard, United States Magistrate Judge. Doc. No. [53]. [1] In the R&R, Judge Howard recommends that Defendant's Motion to Suppress Evidence from Traffic Stop (Doc. No. [22]), be denied.

The facts and procedural history are found in the R&R and are incorporated by reference.  Doc. No. [53].

As stated in the R&R, an Indictment filed August 6, 2024 charges Defendant with possession of a firearm by a convicted felon in violation of

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software. Transcript page number citations are to the actual transcript pages, not the imprinted numbers on CM/ECF.

18 U.S.C. § 922(g)(1). Doc. No. [1]. Defendant moved to suppress evidence seized from his vehicle and person during a traffic stop. Doc. No. [22].

The Magistrate Judge conducted a hearing on Defendant's Motion to Suppress on June 27, 2025 (Doc. No. 25), and the hearing transcript was filed on July 10, 2025 (Doc. No. [33]).

The facts from that hearing relevant to the Motion to Suppress are as follows.

On March 15, 2024, Andrew Ferguson, a Deputy Sheriff with the White County Sheriff's Office, responded to a "threats call" at a location on Post Road. Hrg. Tr. 8, 27. According to the dispatch report, someone reported to dispatch on that date at around 7 p.m. that a man named "Shy" was "outside threatening to come in and shoot them," "he has a gun," he was "outside in his vehicle," a white SUV with Arizona plate number DFW3223, and he was "screaming and blowing the horn," but then he left. Doc. No. [28-1], Def. Ex. 4 at 1–2. The dispatch report indicates that "the lady with the caller is the ex-girlfriend of the 'Shy' subject," and the ex-girlfriend's name is Ashley Hudson. Id. at 2. The caller also advised that "he broke in yesterday" and "stole things." Id. Dispatch wrote that the caller

2

"seems possibly intoxicated."[2] Id. The dispatch report also corrected the subject tag number to Arizona plate number CFW3223 (instead of DFW3223) and reported that it was a rental car, "white Cube." Id. The caller also reported that there were multiple people who were armed but the only ones she knew were "Reno" and "Shy," who "is Darius Damon," and "they showed them multiple guns that they just stuck out the window." Id.

When he arrived, Deputy Ferguson met with Ashley Hudson, who said that her ex-boyfriend, identified as Derrace Damons, had been at her house making threats towards her, that he was in possession of a firearm, and he made threats with the firearm as well. Tr. 8–9, 27–28. Hudson reported that Damons had also been there a couple of days prior and had shot some rounds off over the house towards a window. Tr. 8–9. Neither Defendant nor his vehicle were there when Ferguson was present. Tr. 28. Hudson said that Defendant is "normally armed with a handgun," and she provided a vehicle description, i.e., a white rental car with Arizona plates. Tr. 10, 31. Hudson identified the vehicle as a

---

[2] Defendant asserts that "[t]he dispatcher noted the caller, ASHLEY HUDSON, was 'possibly intoxicated,' " Doc. 37 at 3, but the dispatch report does not indicate that Hudson was the caller. Instead, it indicates that Hudson's unidentified friend or acquaintance was the caller as the report states that "the lady with the caller is the ex-girlfriend" and the caller had to ask Hudson for her last name. See Def. Ex. 4 at 2.

Nissan Cube. Tr. 31, 46. Hudson also said that at one point she had been driving the vehicle. Tr. 46.

During the hearing on the motion to suppress, Ferguson was asked whether Hudson identified the car as a Kia Soul, and he responded, "I don't recall, I may have got my vehicles mixed up," but he was looking for a white vehicle with an Arizona plate. Tr. 31–32. Ferguson testified that he thinks that the Kia Soul and the Nissan Cube "are kind of the same vehicle." Tr. 32. Hudson also "advised that [Damons] was possibly wanted" or he "may have warrants." Tr. 10, 33. Another woman was present when Ferguson was talking with Hudson, who appeared to be a friend of Hudson's, and she was "kind of co-witnessing to what Ms. Hudson was advising." Tr. 10. She was also present when Damons "supposedly fired the round off towards them at the window." Tr. 10. This woman said that Damons was making threats and "that she had knowledge of him making threats to her and that if this other female was a witness to anything that he did to Ms. Hudson, she would have repercussions as well." Tr. 10–11. Ferguson took Damons's name and date of birth and ran it in through GCIC (Georgia Crime Information Center) on his computer on the 15th, "and it came back with a positive warrant or active warrant out of Habersham County." Tr. 18, 33–34.

Damons had a failure to appear bench warrant from the Superior Court of Habersham County for failing to appear before that court on a charge of possession of a firearm by a convicted felon, which Ferguson believes is the warrant that he verified. Tr. 18-19; Doc. No. [27-1], Gov't Ex. 2. That warrant was signed and filed on February 2, 2024. Gov't Ex. 2. When asked whether the computer told him what kind of warrant it was, Ferguson responded that it did: "It gives you the actual warrant information. It was a bench warrant, and I clued in on––the possession of firearm by convicted felon is what I kind of focused on." Tr. 19, 34. Ferguson did not call Habersham County to confirm that the warrant was still active. Tr. 34–35.

Ferguson agreed that the certified copy of the warrant presented at the hearing on Defendant's motion to suppress was "reflective of the same information [he] viewed on the computer[.]" Tr. 19–20.

Ferguson did not take out an arrest warrant for the March 15, 2024 incident involving Ashley Hudson because there was "insufficient probable cause." Tr. 54. He did not flag Defendant's vehicle through GCIC, and he did not check the boxes for wants or warrants on his incident report, but he passed along to the rest of his shift that Defendant was "possibly wanted." Tr. 52–55.

5

Two days later, on March 17, 2024, Deputy Ferguson was patrolling the County from 6 p.m. to 6 a.m. Tr. 6–7. At approximately 3:00 a.m., Ferguson was sitting on the shoulder of Hulsey Road in White County when he saw "a white vehicle traveling southbound on Hulsey Road that was a vehicle of interest that I had taken a report a couple of days prior of a subject that may have had warrants or confirmed warrants out of Habersham County." Tr. 7, 16, 35. The vehicle was a white Kia Soul. Tr. 7–8. Ferguson did not see that it was Defendant who was driving the vehicle. Tr. 36. Ferguson started following the vehicle. Tr. 7, 36–37.

Once he was behind the vehicle, he observed that it "had an out-of-state plate that [he] had run previously." Tr. 8. It was a rental vehicle from the prior incident that Ferguson had investigated a couple of nights prior. Tr. 8. Once Ferguson ran the vehicle, he "confirmed that it was the same vehicle in question," and he "knew the subject that was occupying the vehicle may have warrants or had warrants out of another agency." Tr. 8. Ferguson "confirmed [from] the tag number that was the same vehicle that [he] was actually looking for." Tr. 11.

He followed the vehicle for a couple of miles and "made contact with other deputies that were on the shift with [him] to prepare for a felony stop because we knew the gentleman was armed." Tr. 11, 38. The warrants that they "found on

6

file for him were active warrants for weapons possession," so they were going to conduct a felony stop. Tr. 11.

Deputy Ferguson arrived at a location called Tommy Cowart on U.S. 129, and Deputy Poreda was set up on 129. Tr. 11. As Ferguson was following the vehicle, he did not observe any traffic infractions. Tr. 12, 38. He could not see who was driving the car. Tr. 38. Deputy Poreda joined behind Ferguson and was following as well. Tr. 12. Ferguson activated his blue lights and sirens, and Poreda did as well, but the vehicle they were following did not stop, i.e., the driver failed to yield to the blue lights. Tr. 12, 39–40. Sergeant LeCompte, who was then a deputy but was the supervisor or officer-in-charge (OIC) on shift that night, heard over the radio that deputies were engaged in a chase, joined the pursuit a couple of miles in, and took the primary position in front. Tr. 12, 38, 44, 59–60, 66.

LeCompte pulled up beside the Kia Soul and turned his spotlight on to see if there was anybody else in the vehicle. Tr. 12, 60. He observed Defendant "sitting in the driver's seat operating the vehicle with nobody else in the vehicle." Tr. 60.

LeCompte also saw that the car had Arizona plates. Tr. 61. Prior to the pursuit, LeCompte had information that Deputy Ferguson had received a call "in

reference to an individual operating a vehicle that has warrants as well as possibly shot up the house that he was located at the time." Tr. 61. Although LeCompte had not seen Defendant before that encounter, LeCompte explained that Defendant "had warrants for his arrest and his driver's license picture showed up on our computers in our vehicle" when Ferguson "ran the tag of the vehicle and then we have Mr. Damons'[s] information." Tr. 70, 90. LeCompte isn't sure if he saw Defendant's driver's license on his computer on the 15th, but he saw it on the 17th. Tr. 70–71.

LeCompte was at the Sheriff's Office when he heard Ferguson's call that he was following a vehicle. Tr. 83. He remembers seeing Defendant's picture and information come up on a computer prior to joining the chase, but he does not recall where he was or on what computer he saw that information that night. Tr. 84, 89. LeCompte also had information from the night before from Deputy Ferguson about "a lookout of a vehicle with Arizona plates. And known to carry guns and drugs was the information that [LeCompte] received." Tr. 84–85.

After LeCompte confirmed that Defendant was the only person in the car, he decided to utilize a precision immobilization technique ("PIT") maneuver to force the vehicle to stop, and he advised the other deputies via radio that he was

8

going to perform the PIT maneuver. Tr. 13, 61–62. At that point, the deputies had been following the subject vehicle about 4 to 5 miles with their blue lights and sirens. Tr. 13, 43. There was little to no traffic at that time of night, and the weather was clear. Tr. 13, 61. The deputies were travelling no more than 60 to 65 miles per hour, on a highway with a speed limit of 55 miles per hour. Tr. 13–14. LeCompte testified that if the PIT maneuver is done properly, it is not dangerous. Tr. 62, 74–75. He is certified in performing PIT maneuvers, he has been a driving instructor since 2014, he is a PIT instructor, and he teaches other deputies, officers, and troopers in that technique. Tr. 62. Sheriff's Office policy requires a supervisor to approve the use of a PIT maneuver, and on that night, LeCompte was the shift supervisor and approved its use. Tr. 44, 62–63, 67.

When Sergeant LeCompte performed the PIT maneuver, Defendant was traveling 57 miles per hour. Tr. 63. LeCompte considered the speeds of the vehicles involved in the chase to that point, 50 to 60 miles per hour, to be "pretty low speed." Tr. 74. After the PIT maneuver, the vehicle spun counterclockwise, went up on a bank and over a curb, and hit a couple of road signs, including a mile marker, but the driver was able to recover, get back on the road, and continue south on Highway 129 into Hall County. Tr. 14, 43, 63, 80. LeCompte explained that Defendant "pulled out of the PIT maneuver because it was done

9

at a slow speed." Tr. 63. The subject vehicle then began driving approximately 100 miles per hour, and Deputy Ferguson was traveling 95 to 100 miles per hour to try to keep up with the vehicle. Tr. 14, 42. The pursuit continued into Hall County,[3] and after three to five miles, the front driver's side tire came off the subject vehicle, causing the vehicle to leave the roadway and travel through a horse fence and stop, stuck on the fence. Tr. 14–16, 63–64. Defendant went out the passenger window and started running through a pasture. Tr. 15, 64. Sergeant LeCompte stopped and went to the left side of the vehicle, and Deputies Ferguson and Poreda pulled up. Tr. 15.

Ferguson ran by the car and confirmed that nobody else was in it and then chased the driver through the pasture. Tr. 15–16. LeCompte followed Defendant in his vehicle, opened a gate, and then he continued pursuing Defendant in his patrol car "until he finally gave up and started listening to commands" and was taken into custody. Tr. 15–16, 64–65. LeCompte put Defendant in handcuffs. Tr. 78. The deputies were wearing bodycams during this encounter. Tr. 16–17.[4]

---

[3] Sergeant LeCompte testified that they could continue the pursuit across county lines: "As supervisor, I could authorize that." Tr. 61.

[4] The parties submitted those recordings on a DVD and USB drives. See Gov't Ex. 1; Def. Exs. 1, 3.

10

Once Defendant was arrested, he was placed in LeCompte's patrol vehicle, and the deputies returned to the scene of the crash, called for a wrecker to tow the vehicle, and they began inventorying the vehicle. Tr. 21, 77. The vehicle was a rental car, a Kia Soul. Tr. 45. During the inventory, the deputies found a handgun and suspected narcotics in the passenger's side floorboard. Tr. 21, 81. The deputies had the vehicle towed pursuant to Sheriff's Office policy because it was not operable and was on private property. Tr. 21–22. Sheriff's Office policy also requires the deputies to conduct an inventory search of a towed vehicle before it is towed. Tr. 22. The White County Sheriff's Office issued citations to Defendant for no proof of insurance, no driver's license on person, violation of safety restraint law, failure to maintain lane, and fleeing and attempting to elude. Doc. No. [27-4], Gov't Ex. 5; Tr. 65–66.

Defendant filed a post-hearing brief (Doc. No. [37]), the Government responded (Doc. No. [38]) and Defendant filed a reply (Doc. No. [39]).

By Order and Report and Recommendation (R&R) entered October 9, 2025, the Magistrate Judge recommended that Defendant's Motion to Suppress evidence from traffic stop (Doc. No. [22]), be denied, and certified the case ready for trial. Doc. No. [40].

11

Defendant's attorney at that time, L. Burton Finlayson, filed objections to the R&R (Doc. No. [44]), and Defendant then wrote a letter to the Court requesting "inquiry into counsel conflict and appointment of new counsel," Doc. No. [46]. Mr. Finlayson moved to withdraw as counsel for Defendant. Doc. No. [47]. By Order entered December 17, 2025, the District Judge decertified the case as ready for trial, returned the case to the Magistrate Judge for consideration of Defendant's request for inquiry into counsel conflict, appointment of new counsel, and Mr. Finlayson's motion to withdraw, and recommitted the matters in the October 9th R&R to the Magistrate Judge in light of Defendant's statements in his letter. Doc. No. [48].

By Order entered December 19, 2025, the Magistrate Judge granted Mr. Finlayson's motion to withdraw and appointed Graham McKinnon, IV, to represent Defendant. Doc. No. [49]. The Magistrate Judge also directed substitute counsel to, within 45 days, "evaluate whether he believes Mr. Finlayson had a conflict at the time motions were filed, and if so, to file a motion to re-open the pretrial motion period that outlines how or why a conflict existed during the initial representation." Id. at 2. The Court granted Defendant's requested extensions of that deadline, with the most recent deadline of March 31, 2026, see Docs. Nos. [50], [51], but Defendant did not file a motion to reopen the pretrial

12

motion period based on an alleged conflict with Defendant's prior attorney. Because Defendant has not shown that there was a conflict involving his prior attorney that warrants a re-opening of the pretrial motion period, the Magistrate Judge re-stated the Order and Report and Recommendation originally entered October 9, 2026 on Defendant's pretrial motions. Doc. No. [53].

As re-stated in the R&R, on April 2, 2026, the Magistrate Judge entered a R&R recommending denial of the pending motions to suppress. Doc. No. [53].

On April 17, 2026, Defendant filed objections to the R&R, which incorporated the objections the initial R&R. Doc. Nos. [44]; [55]. Defendant's objections to the R&R are: (1) Mr. Damons never threatened Ms. Hudson with a firearm on March 15, 2024, and did not discharge a weapon over the house the day before; (2) the allegations of misconduct amount to unreliable hearsay; (3) officers lacked reasonable suspicion to stop the rental car on March 17, 2024; (4) the evidence of a warrant for Defendant's arrest is insufficient; (5) identification of the driver was required prior to stopping the rental car; (6) corroboration was required before the blue-lights and PIT[5] maneuver, not after; (7) the White County deputies were not credible; (8) the PIT maneuver was

---

[5] "PIT" means precision immobilization technique. Doc. No. [53], 10.

an unreasonable and unlawful use of deadly force; (9) Defendant's failure to stop was justified and reasonable; and (10) Defendant maintained standing to challenge the seizure and search of the vehicle he was lawfully driving.

## I.    LEGAL STANDARD

This Court must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which" a party objects. 28 U.S.C. § 636(b)(1)(C). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. And this Court may "receive further evidence or recommit the matter to the magistrate judge with instructions." Id.[6]

The Court now considers Defendant's objections in turn.

## II.    OBJECTION 1

Defendant's first objection is that he never threatened Ms. Hudson with a firearm on March 15, 2024, and did not discharge a weapon over the house the

---

[6] The Court has also carefully reviewed the transcript of the hearings before the magistrate judge (Doc. No. [33]), exhibits, as well as the briefing and the full record. See United States v. Elsoffer, 644 F.2d 357, 358 (5th Cir. 1981) (per curiam) (holding that the district judge must also "read the transcript of the hearing before a magistrate on a motion to suppress, before adopting the magistrate's recommendation"); Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions rendered prior to the close of business on September 30, 1981 by the United States Court of Appeals for the Fifth Circuit).

14

day before. Doc. No. [44], 2. In support of this objection, he includes a sworn statement from Ashley Hudson that was not presented to the Magistrate Judge at the suppression hearing. Doc. No. [44-1]. Defendant admits that Deputy Ferguson testified he had been told about the threats and weapon by the women, i.e., Ms. Hudson and her friend. Doc. No. [44], 2 (citing June 27, 2025 Hrg. Tr., Doc. No. [33], 8–9,27–28). Defendant's admission as to the contradictory evidence about his actions on the date in question creates an issue for the jury, not for this Court to resolve by objections to the R&R. In addition, it has been held that "an objection to a report and recommendation is not the place to assert new factual allegations." Powell v. Burger Docs Atlanta, Inc., No. 1:19-CV-3808-MLB, 2021 WL 4192864, at *6 (N.D. Ga. Sept. 14, 2021). Defendant's first objection is **OVERRULED**.

## III.    OBJECTION 2

Defendant's second objection is that the allegations of misconduct amount to unreliable hearsay. Doc. No. [55], 1.

The Court first notes that a hearsay argument was not raised in the post-hearing briefing before the Magistrate Judge. Nevertheless, "[a] district court does not abuse its discretion by accepting an argument not raised before the magistrate judge." United States v. Franklin, 694 F.3d 1, 6 (11th Cir. 2012). To

the extent that it is proper for the Court to consider the hearsay objection, it is overruled, as the Supreme Court has held that "[a]t a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." United States v. Raddatz, 447 U.S. 667, 679 (1980). Defendant's second objection is **OVERRULED**.

IV.    **OBJECTION 3**

Defendant's third objection is that the officers lacked reasonable suspicion to stop the rental car on March 17, 2024. Doc. No. [44], 2. Defendant asserts that the deputies only had a "hunch" and "no particularized or objective basis for suspecting the Kia driver of criminal activity." Id.

After *de novo* review, the Court finds the Magistrate Judge's R&R to be correct in law and fact. As stated in the R&R, the Court finds that under the totality of the circumstances, Deputy Ferguson had a reasonable articulable suspicion to believe that Defendant was driving the vehicle used in the alleged threats on Ms. Hudson and her friend reported less than 48 hours before and therefore had authority to conduct an investigative stop of the vehicle in order to: (1) investigate whether Defendant was driving the vehicle, (2) investigate the allegations that Ms. Hudson and her friend made against Defendant, (3) investigate the involvement of that vehicle in the events reported by Hudson

16

and her friend, and (4) investigate the issuance of the bench warrant by Habersham County. Doc. No. [53], 16. In essence, there was a particularized and objective basis for suspecting the Defendant of criminal activity and his assertions to the contrary do not undermine the finding of reasonable suspicion. See Navarette v. California, 572 U.S. 393, 396 (2014) (indicating that an officer making a stop must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity") (citing United States v. Cortez, 449 U.S. 411, 417–18 (1981)).

**V.      OBJECTION 4**

Defendant's fourth objection is that the evidence of a warrant for Defendant's arrest is insufficient. Doc. No. [55], 4. Defendant states that the "evidence of Deputy Ferguson verifying the existence of an arrest warrant on May 15, 2024 is inconsistent." Id. Defendant states that "[n]o documents were presented that confirm any GCIC inquiry was made by Deputy Ferguson on May 15, 2024 or at anytime before the traffic stop on May 17, 2024." Id. And "Deputy Ferguson admits that he failed to verify the validity of any arrest warrant prior to Defendant's traffic stop several days later on May 17, 2024." Id.

After *de novo* review, the Court again finds the Magistrate Judge's R&R to be correct in law and fact. The Court agrees with the Magistrate Judge's finding

that Defendant's evidence and argument do not "undermine Ferguson's testimony that he knew about the Habersham County bench warrant before the stop on March 17, 2024." Doc. No. [53], 21. And Defendant cites no binding authority that shows that Deputy Ferguson had to obtain a copy of the warrant or do more than he testified to with respect to the arrest warrant, prior to initiating a traffic stop.

## VI.   OBJECTION 5

Defendant's fifth objection is that identification of the driver was required prior to stopping the rental car. Doc. No. [44], 4.

After *de novo* review, the Court finds the Magistrate Judge's R&R to be correct in law and fact and upholds the Magistrate Judge's finding that Sergeant LeCompte testified credibly concerning his involvement in the events of March 17, 2024, even if his memory might not have been perfect. Doc. No. [53], 20. Also, as stated by the Magistrate Judge, "it is not disputed that prior to performing the PIT maneuver, LeCompte pulled up next to Defendant's vehicle and was able to determine that Defendant was driving and that no one else was in the vehicle." Doc. No. [53], 23 (citing Tr. 12, 60).[7]

---

[7] And to the extent that Defendant's objection is actually addressing, Deputy Ferguson's initial attempt to stop the car, the Court notes that he does not address the

Objection Number 5 is **OVERRULED**.

## VII.   OBJECTION 6

Defendant's sixth objection is that corroboration was required before the blue-lights and PIT maneuver, not after. Doc. No. [44], 9. Defendant states that Deputy Ferguson "observed nothing to corroborate the allegations from Ms. Hudson and her friend." Id. at 10. In support of his argument, Defendant cites authority regarding "tips" to police; however, the Court notes that Ms. Hudson and her unidentified friend[8] are considered alleged victims under the facts presented and the Eleventh Circuit has held that "[t]here is no need to establish the reliability of information received from the victim of a crime." United States v. Johnson, 713 F.2d 654, 660 (11th Cir. 1983); see also United States v. Holmes, 141 F.4th 1183, 1195 (11th Cir. 2025).[9]

---

Magistrate Judge's citation of authority explaining that "if there is reasonable suspicion to believe that a particular car was involved in a prior crime, there is no need to have reasonable suspicion . . . that the occupants themselves had been involved in the [crime]." Doc. No. [53], 19 (cleaned up) (citing United States v. Turk, No. 1:20-CR-253-TWT-CCB, 2024 WL 5670642, at *4 (N.D. Ga. Dec. 23, 2024) (quoting United States v. Jackson, 700 F. App'x 411, 416 (6th Cir. 2017) and citing United States v. Marxen, 410 F.3d 326, 332 (6th Cir. 2005) (finding reasonable suspicion where the officers had information connecting the car, but not the owner of the vehicle, to a prior robbery)), adopted by 2025 WL 1211110 (N.D. Ga. Apr. 25, 2025).

[8] As stated above, the unidentified friend was also present when Damons "supposedly fired the round off towards **them** at the window." Tr. 10 (emphasis added).

[9] Even if there were a corroboration requirement, the Magistrate Judge correctly noted

19

The sixth objection is **OVERRULED**.

## VIII.  OBJECTION 7

Defendant's seventh objection is that the White County deputies were not credible. Doc. No. [44], 11.

"'[T]o adequately determine the credibility of a witness . . . the fact finder must observe the witness.'" United States v. Powell, 628 F.3d 1254, 1257 (11th Cir. 2010) (citing Louis v. Blackburn, 630 F.2d 1105, 1110 (5th Cir. 1980)). "This requirement is satisfied 'either by the district judge accepting the determination of the magistrate after reading the record, or by rejecting the magistrate's decision and coming to an independent decision after hearing the testimony and viewing the witnesses.'" Id. (citation omitted).

Here, the Court has read the record[10] and after reading the record, the Magistrate Judge's credibility determinations are accepted. The Court is not required to rehear the testimony on which the magistrate judge's findings and

---

that the deputies sought to corroborate by looking for the vehicle with the tag number at issue. Doc. No. [53], 18.

[10] "The statutory obligation of the district court to give independent consideration to those portions of the R&R to which objection is made does require the court to consider the actual testimony relevant to the objections, and not merely the R&R." United States v. Dorvilus, 357 F. App'x 239, 245 (11th Cir. 2009).

20

recommendations are based to make an independent evaluation of credibility. United States v. Raddatz, 447 U.S. 667, 673 (1980).

Defendant's seventh objection is **OVERRULED**.

## IX. OBJECTION 8

Defendant's eighth objection is that the PIT maneuver was an unreasonable and unlawful use of deadly force. Doc. No. [44], 14.

The Court does not agree and after *de novo* review, the Court concludes that the R&R is correct in law and fact. As correctly stated by the Magistrate Judge, in considering the applicable legal factors, "it was objectively reasonable for LeCompte to use the PIT maneuver to attempt to stop Defendant." Doc. No. [53], 25.

> Defendant had not complied with multiple deputies signaling to him to stop by their sirens and blue lights. The deputies had information that Defendant had a bench warrant from Habersham County for failing to appear in court for a felon in possession of a firearm charge, and they had information that his ex-girlfriend and another witness accused him of very recently threatening them and discharging a firearm, thus indicating that he continued to be armed and a threat to others. LeCompte, who was certified and trained in PIT maneuvers—and even taught other officers how to conduct them, attempted to perform the PIT maneuver at a low speed at a time when there was not a lot of traffic on the road, thus minimizing the risk of danger to Defendant, the other officers, and the travelling public.

21

> Moreover, the force used to perform the maneuver was insufficient to actually stop, i.e., seize, Defendant as he was able to continue driving for miles thereafter, at speeds of approximately 100 miles per hour. The record does not contain any evidence of injury to Defendant, but Defendant asserts that "the Kia Soul was severely damaged by the PIT maneuver" as its "front tires were shredded when the car was forced to strike two curbs." Doc. 37 at 32. The record does not show whether the tire damage was caused by the PIT maneuver, Defendant's excessive speed following the PIT maneuver, or a combination, but the damage from the PIT maneuver was not so great that it prevented the vehicle from continuing to be mobile and capable of driving approximately 100 miles per hour.

Doc. No. [53], 25–26.

Defendant also cites no binding authority (in support of his objection) in which the Eleventh Circuit or the Supreme Court has excluded evidence following an arrest based on the use of a PIT maneuver (or an alleged violation of the County's policy regarding use of excessive force).

In Herring v. United States, 555 U.S. 135, 140 (2009), the Supreme Court held that "[t]he fact that a Fourth Amendment violation occurred—i.e., that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." And in an analogous context in which the Eleventh Circuit was considering an argument about whether the district court abused its discretion in denying a defendant's motion for new counsel, the Court stated:

> For example, [the defendant] testified that counsel refused to heed his argument that the police used excessive force when they arrested him and searched his car. But the magistrate judge explained that [the defendant's] argument "wouldn't keep the evidence [that he sought to suppress] from coming in at trial." Because [the defendant] did not establish good cause,[11] the district court correctly denied his motions for new appointed counsel.

United States v. Joyner, 899 F.3d 1199, 1206 (11th Cir. 2018).

While not entirely on point (in terms of procedural posture), the Court draws guidance from the Joyner decision in which the Eleventh Circuit did not find a fundamental problem (or error) with the magistrate judge's statement regarding an excessive force argument not keeping evidence (that was sought to be suppressed) from coming in at trial.[12]

---

[11] "Good cause in this context means a fundamental problem, 'such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict.'" United States v. Joyner, 899 F.3d 1199, 1205 (11th Cir. 2018) (citations omitted).

[12] It also appears that non-binding authority (from the Court's independent research) does not entirely support Defendant's objection. See Evans v. Poskon, 603 F.3d 362, 364 (7th Cir. 2010) ("The exclusionary rule is used in only a subset of all constitutional violations—and excessive force in making an arrest or seizure is not a basis for the exclusion of evidence."); Williams v. United States, No. 215CR00283LSCSGC15, 2019 WL 2338607, at *6 (N.D. Ala. June 3, 2019) ("[E]ven if this Court were to have concluded that the flash bangs that was used constituted excessive force, it does not necessarily follow that the evidence obtained later was due to be suppressed."); United States v. Tyms, No. 2:22 CR 21, 2022 WL 16855307, at *1 (N.D. Ind. Nov. 10, 2022) ("[E]ven if high-speed chases violate constitutional protections (and, for clarity's sake, the court does not

23

In light of the above, after *de novo* review, the Court concludes that the R&R is correct in law and fact. Defendant's eighth objection is **OVERRULED**.

## X.    OBJECTION 9

Defendant's ninth objection is that Defendant's failure to stop was justified and reasonable. Doc. No. [44], 19. The essence of Defendant's argument is that he had the "right to flee an illegal arrest," under Georgia law. Doc. No. [44], 21. However, in light of the R&R (as adopted by this Court after *de novo* review) and above-stated authority and analysis, the Court does not agree that Defendant's stop and arrest were unlawful. As such, Defendant's ninth objection is **OVERRULED**.

---

conclude that they do), the interest involved (the protection of human life and limb) is unrelated to an individual's interest in preventing the government from seeing or taking objects from inside his vehicle. Like a knock-and-announce violation or the use of excessive force during an arrest, the fact that a pursuit was made at high speeds is collateral to a subsequent seizure. Accordingly, the exclusionary rule does not apply and suppression of evidence is not an available remedy."); United States v. Ankeny, 502 F.3d 829, 837 (9th Cir. 2007) ("Ultimately, we need not determine whether the entry was unreasonable because we agree with the district court that suppression is not appropriate in any event. The alleged Fourth Amendment violation and the discovery of the evidence lack the causal nexus that is required to invoke the exclusionary rule.").

## XI.    OBJECTION 10

Defendant's final objection is that he maintained standing to challenge the seizure and search of the vehicle he was lawfully driving. Doc. No. [44], 22. Defendant states that "[a]ny abandonment of the vehicle by [him] was involuntary and proximately caused by the White County deputies' misconduct, including the illegal traffic stop and the deputies' excessive use of force." Doc. No. [44], 23.

In light of the R&R (as adopted by this Court after *de novo* review) and above-stated authority and analysis, the Court does not agree that Defendant's stop and arrest were unlawful. The Court also upholds the Magistrate Judge's finding that the deputies acted reasonably in pursuing Defendant and in attempting the PIT maneuver to try to stop his vehicle and that their efforts did not violate the Fourth Amendment, including the prohibition on excessive use of force to effectuate their seizure of Defendant. Doc. No. [53], 30.

Under applicable law and the circumstances (of which Defendant fled the Kia Soul through the passenger window after crashing it and then ran away from the vehicle through a pasture, only stopping after law enforcement gave chase and apprehended him), the Court finds that Defendant voluntarily abandoned his reasonable expectation of privacy in the Kia Soul and its contents. See United

25

States v. Johnson, 811 F. App'x 564, 569–70 (11th Cir. 2020) ("In applying the abandonment doctrine in the automobile context, [the Eleventh Circuit] has held that a defendant who abandons his car to flee from law enforcement officers has no reasonable expectation of privacy with respect to the car and thereby forfeits his right to Fourth Amendment protection in it."); see also Doc. No. [53], 31–32.

Defendant's tenth objection is **OVERRULED**.

## XII.   CONCLUSION

After *de novo* review, the R&R (Doc. No. [53]) is **ADOPTED** as the order of the Court. Defendant's objections to the R&R (Doc. Nos. [44] and [55]) are **OVERRULED**. The Motion to Suppress (Doc. No. [22]) is **DENIED**.

A Jackson-Denno hearing will be scheduled regarding the Motion to Suppress Statements (Doc. No. [23]) at a later date. The Clerk is **DIRECTED** to reopen the motion at Doc. No. [23] and return the Motion to the Court's pending motions list.

A pretrial conference and trial date will be scheduled at a later time by the Courtroom Deputy Clerk.

**IT IS SO ORDERED** this 27th day of May, 2026.

**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

26